

FILED

May 20 2016, 10:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Andrea L. Ciobanu
Alex Beeman
Ciobanu Law, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

William J. Beggs
Jennifer L. Upton
Bunger & Robertson
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David L. Kimbrough,

*Appellant-Plaintiff,*

v.

Ramona F. Anderson,

*Appellee-Defendant*

May 20, 2016

Court of Appeals Case No.
53A05-1507-PL-883

Appeal from the Monroe Circuit
Court

The Honorable E. Michael Hoff,
Judge.

Trial Court Cause No.
53C01-1208-PL-1670

**Mathias, Judge.**

[1]     David Kimbrough ("Kimbrough") filed a complaint in Monroe Circuit Court against Ramona Anderson ("Anderson"), alleging that Anderson was liable for damages when Kimbrough's basement flooded on numerous occasions between 2008 and 2011 after Anderson excessively watered her yard. A jury found in

favor of Anderson, and Kimbrough now appeals, raising eight issues, which we consolidate and restate as:

1. Whether the trial court abused its discretion in precluding testimony from Anderson's insurance company regarding instructions given to Kimbrough;
2. Whether the trial court abused its discretion in admitting Kimbrough's prior home insurance claim file into evidence;
3. Whether the trial court abused its discretion in admitting a hydrogeologist's expert report into evidence;
4. Whether the trial court abused its discretion in denying Kimbrough's motion for judgment on the evidence on two of Anderson's affirmative defenses; and
5. Whether the trial court abused its discretion in instructing the jury on final instruction numbers 8 and 9, concerning Anderson's affirmative defenses.

We affirm.

**Facts and Procedural History**

Kimbrough purchased and moved into a home located on Robins Bow ("the Residence") in a neighborhood in Bloomington, Indiana in 2001.[1] The Residence is a two-story home, with the back side, garage, and part of the west side mostly underground. The lower level includes a library, an office, two bedrooms, a bathroom, a laundry room, and a recreation room. All of the walls

---

[1] Kimbrough now resides with his parents in Kokomo, Indiana and since trial has sold the Residence. Although Kimbrough primarily resided at the Residence, his wife lives in Romania, and he frequently traveled to visit her and teach various courses abroad during these incidents.

and ceilings are made of drywall, and all floors are carpeted except for tile in the hallways and bathrooms.

[4]     The Residence has experienced numerous water intrusion problems over the years. Before Kimbrough purchased the Residence, the foundation was repaired in 1995 due to settlement that stemmed from cracks in the basement floor slab. Between 2001 and 2005, Kimbrough left a basement window open for approximately one week, causing water damage. Another water issue occurred during the same time period when an ice maker water line broke.

[5]     In 2006, more serious damage occurred when a water line in the garage froze and ruptured while Kimbrough was out of town. This break caused water to run under the wall and into the living room, office, bathroom, utility room, and library, leaving about three to four inches of standing water in the lower level. Kimbrough filed a claim with his insurance company and the damage was remedied by drying, re-painting, and re-drywalling the lower level of the Residence. The contractors who repaired the damage indicated on the invoice that they discovered "non-loss related mold" in the den and told Kimbrough that the mold had not been caused by that particular incident.

[6]     Anderson and her late husband[2] moved into a home on Elizabeth Court to be closer to family in 2006.[3] Anderson's home and the Residence are adjacent

---

[2] Anderson's husband, Robert, passed away during the trial court proceedings in 2012.

[3] Anderson sold the Elizabeth Court home on December 1, 2013, but we will refer to the house on Elizabeth Court as "Anderson's home" to simplify the sequence of events.

properties, with the Residence located directly north of Anderson's home. The front of the Residence faces north, and the back faces south and sits lower than Anderson's home.

[7] Anderson took pride in taking care of her yard, especially the flowers and plants. She watered her plants in the early morning, and when the weather was hot, she watered daily. As a result, Anderson's water usage dramatically increased during the summer months. Most of Anderson's watering occurred in the front yard, and she watered less frequently in the back yard, which was adjacent to the Residence. On occasion, Anderson would use a sprinkler to water as well.

[8] Again in 2007, water infiltrated Kimbrough's lower level. Kimbrough alleged that the damage was caused by Anderson leaving her sprinklers on for extended periods of time and filed a lawsuit against the Andersons.[4] In August 2008, Kimbrough returned home and found a large amount of water in the lower level again. He observed that the ground behind the Residence was wet but Anderson's sprinkler was not turned on. Kimbrough cleaned up the water with a Shop Vac, fans, and a mop and bucket.

[9] A few months later, Kimbrough noticed spots of mold appearing in the Residence. Kimbrough tried to remedy the problem by running a dehumidifier, an air conditioner, and a furnace, and he used an infrared filter to prevent the

---

[4] That case was settled, and Kimbrough released all claims for damage prior to December 31, 2007.

mold from spreading into the ducts. He also called Valerian Simianu, Ph.D. ("Dr. Simianu"), an environmental consultant, to conduct an inspection. Dr. Simianu concluded that mold was present in the Residence and recommended that the source of moisture be identified and removed. Due to the mold issues and concern for his health, Kimbrough moved out of the Residence in Spring 2009. However, he would return to Bloomington every two or three days to pick up mail, go to the bank, go to work, and maintain the Residence.

[10] Kimbrough returned in late-summer 2009 to find water running into the back of the Residence. He noticed that Anderson's sprinklers were on near the fence between the two properties. Kimbrough took pictures of what he described as "pooling" water in Anderson's yard. Tr. p. 306. The pictures Kimbrough submitted show a glare, which Anderson claims have been distorted. Further, Kimbrough approached two of his neighbors[5] to observe the sprinkler running. He then called the police and asked them to shut off Anderson's water. Kimbrough indicated that the responding officer shut off the water, but Anderson and the officer reported that the sprinklers were not on at the time the officer arrived.

[11] After the responding officer left, Anderson asked two different neighbors to walk along the yard between the Residence and Anderson's home. Both

---

[5] One neighbor passed away before trial, and the other neighbor wrote a letter detailing that on August 8, 2009, he observed a sprinkler running in Anderson's yard and standing water on both sides of the fence dividing the two properties.

neighbors reported that the ground was dry and no standing water was in either yard. Anderson also submitted pictures taken by one of the neighbors at trial. This incident allegedly caused another "mess" in Kimbrough's lower level, and he again cleaned up the water in the same manner as before. Tr. pp. 311-12.

[12] Another similar incident occurred in September 2010. Kimbrough arrived at the Residence, found standing water in the lower level, and noticed that Anderson's sprinklers were running. Again, Kimbrough called the police and asked them to turn off Anderson's water. Yet again in 2011, Kimbrough returned to the Residence to find water in the lower level. Anderson's sprinklers were not running at this time. Kimbrough cleaned up the water again, but the condition of the house continued to deteriorate.

[13] Despite Dr. Simianu's recommendations in 2008, Kimbrough did not follow his instructions to remedy the mold problem. Kimbrough's insurance would not pay to fix the damage, and Kimbrough explained that he did not have the economic means to do so. He also was concerned that he would be destroying evidence and that this could affect his ability to recover from Anderson's insurance company.

[14] The Residence was appraised in February 2009 by real estate broker Bill Howard ("Howard") at between $400,000 and $450,000 if no mold damage existed, but at that point, the house had "really pervasive mold damage." Tr. p. 685. Howard returned in 2014 to inspect and appraise the Residence and valued the property at $45,000, which represents the lot value minus tear down costs.

Kimbrough also did not remove any personal property from the Residence after the damage occurred, including a sixty-three-piece art collection. Art appraiser, John Scott Keller ("Keller") valued half of the collection to be worthless due to mold contamination.

[15] Professional engineer James Barker ("Barker") visited the Residence in January 2012 when Kimbrough's yard was wet due to several days of rain. After completing an inspection, Barker found no water in the lower level. In March 2012, the Monroe County Assessor removed the Residence from the property tax roll due to "severe black mold damage." Tr. p. 578. This determination was made after Deputy Assessor of Monroe County made a home inspection and noted that the Residence was "unlivable." Tr. p. 579. As a result, by the time Dr. Simianu returned in 2013 to take air samples, the overall mold condition had worsened. Dr. Simianu again suggested remediation, but when he returned in 2014, he noticed the mold was even worse than the previous year. By this point, the cost of remediation was much higher[6] than when Dr. Simianu first suggested it in 2008.

[16] On August 21, 2012, Kimbrough filed a complaint in Monroe Circuit Court against Anderson, alleging negligence and other civil torts. Specifically, Kimbrough alleged that between 2008 and 2011, Anderson's watering habits caused mass amounts of water to flow from her yard into the lower level of the

---

[6] Dr. Simianu estimated that it would cost $60,000 to remediate a six hundred square foot area by this point.

Residence. On December 10, 2012, Anderson filed her answer, asserting the affirmative defenses comparative fault and failure to mitigate.

[17] Civil engineer Christopher Weil[7] ("Weil") visited the Residence in September 2014 to determine the cause of the water damage in Kimbrough's lower level. Weil observed silt that was left in the interior of the lower level, which indicated a significant amount of water pressure against the south wall of the Residence caused by oversaturated soil. After investigation and review of Anderson's water usage records, Weil concluded that the only way for the soil near the south basement to become that saturated was due to overwatering by Anderson.

[18] Robin Guyton ("Guyton"), receivables manager at City of Bloomington Utilities, explained that Anderson's water usage was higher in the summer months due to watering and indicated that Anderson had an issue with a running toilet at the same time. Anderson also explained that she used more water in the summer months because she loved "green lawns" and her family stayed at her home for longer periods of time when the children were out of school and due to her late husband's illness. Tr. pp. 887-88.

[19] Licensed contractor and home inspector, Leonard Murrell ("Murrell") also visited the Residence in 2014. Murrell identified numerous maintenance issues outside of the Residence, including: blocked gutters, roots growing up next to

---

[7] Weil is referred to throughout the transcript as "Wyle."

the foundation, a crack in the block of the basement window well, debris in the window well, and a hole in the mortar joint. Murrell explained that these issues could allow water to infiltrate into the wall and then into the foundation. Specifically, Murrell believed that the water was entering through the cracked block and suggested that the Residence could benefit if a sump pump was installed. At this time, he estimated the cost to repair the damage to the lower level at $57,626.45. Tr. p. 928.

[20] Hydrogeologist[8], Sally Letsinger, Ph.D. ("Dr. Letsinger") also was consulted to determine what caused water to infiltrate the lower level of the Residence. Dr. Letsinger focused on detailed elevation information to study the drainage characteristics, detailed soil information to determine the absorptive and infiltration properties of the neighborhood, and weather information during the time period at issue. Based on her study, Dr. Letsinger concluded that the irrigation use coming from Anderson's property was reasonable and that during summer months subsurface water migration is unlikely to occur due to the water being taken in by plants and soil. Further, she noted that sprinkler water would not have behaved any differently than rain water. Dr. Letsinger attributed the cause of water infiltration problems at the Residence to poorly installed drains around the perimeter or foundation of the house, lack of a sump pump, poor grading, or poorly maintained gutters.

---

[8] Hydrogeologists study the movement of water.

[21] Prior to trial, both Kimbrough and Anderson filed numerous motions in limine.[9] Anderson filed her first motion on May 29, 2015, and third motion on June 4, 2015, seeking to preclude any evidence of her liability insurance at trial. Anderson's first motion generally sought to exclude evidence of insurance under Indiana Evidence Rule 411, while her third motion specifically sought to exclude testimony from Anderson's insurance company that they instructed Kimbrough not to remove damaged items from the Residence, mitigate damages, or destroy evidence under Indiana Evidence Rules 411 and 403. Kimbrough responded that he should be permitted to introduce this testimony to rebut Anderson's affirmative defense that he failed to mitigate damages.

[22] On June 11, 2015, the trial court granted Anderson's motions in part with respect to references about insurance and denied them in part, allowing Kimbrough to offer evidence of statements made by a representative of Anderson's insurance company after December 31, 2007. The next day, Anderson filed a motion to reconsider the court's rulings on her first and third motions in limine.

[23] The five-day jury trial began on June 15, 2015, with arguments regarding Anderson's motion to reconsider outside the presence of the jury. Kimbrough made an offer of proof of his proposed testimony of claims adjustor, Thomas

---

[9] Only Anderson's first and third motions in limine and Kimbrough's third Motion in limine are relevant to this appeal.

Best[10] ("Best"). The trial court then granted Anderson's motion to reconsider its ruling on Anderson's first and third motions in limine. On June 17, 2015, Kimbrough filed a motion to reconsider on this issue, and the trial court denied it.

[24] On June 18, 2015, Kimbrough filed a third motion in limine, seeking to exclude evidence regarding his 2006 home insurance claim stemming from water damage in his basement due to privilege. Both parties made arguments outside the presence of the jury, and the trial court concluded that the information was not privileged, allowing the file to later be admitted into evidence. The same day, Kimbrough made an oral motion in limine to exclude the introduction of Anderson's expert report prepared by Dr. Letsinger. Kimbrough argued that unless Dr. Letsinger read the entire report "word for word" that it was inadmissible hearsay. Tr. p. 966. The trial court denied Kimbrough's motion, and Dr. Letsinger's report was later admitted into evidence.

[25] Both parties submitted proposed jury instructions on June 18, 2015, as well. On June 19, 2015, the trial court heard arguments on the proposed final instructions. Kimbrough made objections to instruction numbers 8, 9, and 10. The trial court overruled Kimbrough's objections to instruction numbers 8 and 9. That same day, after both parties finished presenting evidence, Kimbrough filed a motion for judgment on the evidence relating to Anderson's affirmative

---

[10] Throughout the transcript, Best is incorrectly referred to as "Betts."

defenses of Kimbrough's comparative fault and failure to mitigate damages. This motion was argued outside the presence of the jury. The trial court denied the motion and determined that the evidence presented at trial created questions of fact that were for the jury to decide. After deliberations, the jury returned a verdict in favor of Anderson, concluding that she was not at fault for the damage to the Residence. The trial court entered judgment on June 24, 2015. Kimbrough now appeals.

## Trial Court's Admission and Exclusion of Evidence

[26] Kimbrough argues that the trial court erred in excluding comments made by Anderson's insurance adjustor, in admitting Kimbrough's prior home insurance claim file, and in admitting an expert report submitted by Anderson. The decision to admit or exclude evidence lies within the sound discretion of the trial court, and we will not disturb the trial court's decision absent a showing of an abuse of that discretion. *Weigel v. Weigel*, 24 N.E.3d 1007, 1010 (Ind. Ct. App. 2015). A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court. *Speybroeck v. State*, 875 N.E.2d 813, 818 (Ind. Ct. App. 2007).

[27] Even if an evidentiary decision is an abuse of discretion, we will not reverse if the ruling constituted harmless error. *Techna-Fit, Inc. v. Fluid Transfer Prods., Inc.*, 45 N.E.3d 399, 411 (Ind. Ct App. 2015) (citing *Spaulding v. Harris*, 914 N.E.2d 820, 829-30 (Ind. Ct. App. 2009), *trans. denied*). An error is harmless when the probable impact of the erroneously admitted or excluded evidence on the

factfinder, in light of all the evidence present, is sufficiently minor so as not to affect a party's substantial rights. *Crider v. Crider*, 15 N.E.3d 1042, 1061 (Ind. Ct. App. 2014), *trans. denied*; Ind. Trial Rule 61.

*A. Anderson's Insurance Adjustor's Comments*

[28] Kimbrough specifically contends that the trial court erred in excluding comments made to Kimbrough by insurance adjustor Best because it incorrectly applied Indiana Evidence Rule 411 and failed to make an Indiana Evidence Rule 403 determination. Under Indiana Evidence Rule 411,

> Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control.

The purpose of Rule 411 is "to prevent juries from inferring fault or calculating damages based on parties' liability coverage or lack thereof. *Spaulding v. Harris*, 914 N.E.2d 820, 830 (Ind. Ct. App. 2009). Notwithstanding the general bar imposed by Rule 411, insurance evidence may be admitted for other purposes other than implying fault or influencing damage awards. *Id.* Rule 411 provides a non-exhaustive list of permissible purposes, but "[t]he number of possible alternative uses of the existence or nonexistence of liability insurance evidence is, of course, unlimited." *Id.* at 830-31.

[29] "If the evidence is offered for a purpose not prohibited by Rule 411, admissibility is governed by the balancing test of Rule 403, and exclusion may be appropriate if the fact to be proven is not in genuine dispute." *Id.* at 831. Indiana Evidence Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *Id.*

[30] Despite Kimbrough's assertion that the trial court did not make a Rule 403 determination, the court stated:

> [T]he problem with admitting this testimony is then we're injecting the insurance issue into the case when the, the question is supposed to be what did the parties do, not what the insurers might have done. I don't think its objectively reasonable for, um, Mister Kimbrough to rely on instructions from an insurance adjustor, especially when he has a lawyer representing him. . . Um, was it, would it be reasonable for Mister Kimbrough to continue to rely on, ah, ah, a statement from his adversary in the insurance company, for, ah four years while he's represented by all of these lawyers? I don't think it would be, but the only reason I'm considering that at all is because I'm trying to balance that against the, ah, the evidence rule that excludes evidence of insurance. So, if we ignore that evidence rule or disregard it, find that something else is more important, what is that more important thing? It, it may be that it explains why Mister Kimbrough apparently took no steps to repair his house, but certainly he doesn't act on instructions from the insurance company. They can make suggestions. They can tell him their terms. He's not compelled to follow them. Ah, there, there's simply no good reason to disregard the basic rule that we don't

talk about insurance. Well, you know, we don't inject insurance into this controversy, and there's no way to do this without making that a central issue instead of a subsidiary issue.

Tr. pp. 176-78.

[31]  We conclude that in its discretion, the trial court conducted a Rule 403 balancing and determined that admitting Best's testimony would confuse the issues and mislead the jury. Therefore, we cannot say that this decision is clearly against the logic and effect of the facts and circumstances that were before the court and is not an abuse of discretion.

*B. Kimbrough's 2006 Home Insurance Claim File*

[32]  Kimbrough also argues that his 2006 home insurance claim file regarding water damage in the lower level was privileged and therefore inadmissible under *Richey v. Chappell*, 594 N.E.2d 443 (Ind. 1992). In that case, the Richeys were involved in an automobile accident with Chappell and brought a claim against him a couple of years later. Chappell made a statement to his insurance company about the accident after it occurred, and the Richeys sought to discover the statement during the course of litigation. Our supreme court held that where a policy of insurance requires an insurer to defend claims against the insured, statements from the insured to the insurer concerning an occurrence which may be the basis of a claim by a third party are protected from disclosure. *Id.* at 447. *Richey's* application is limited to situations where an insurer is required to defend the insured in an action by a third party.

[33]     Here, Kimbrough's insurance company was not defending him in an action by a third party. Rather, Kimbrough sued Anderson on an entirely unrelated incident and the claim file was related to water damage from 2006 in the basement of the Residence. Kimbrough's statements to his insurance company would have been privileged if it had to defend Kimbrough in the claim arising from 2006, but this is simply not the case. We therefore conclude that the 2006 claim file was not privileged and the trial court did not abuse its discretion in admitting it into evidence.

*C. Dr. Letsinger's Expert Report*

[34]     Kimbrough also contends Dr. Letsinger's expert report was inadmissible hearsay because it was prepared in anticipation of litigation. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted therein, which rests on the credibility of the out-of-court declarant who is unavailable for cross-examination. *Miller v. State*, 575 N.E.2d 272, 274 (Ind. 1991). If the challenged evidence is hearsay, then it is inadmissible unless it meets one of the exceptions to the hearsay rule. Ind. Evidence Rule 802. Under Indiana Evidence Rule 703:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

"The erroneous admission of hearsay evidence does not automatically constitute reversible error." *Miller*, 575 N.E.2d at 275. Appellate Rule 66(A) provides the harmless error standard:

> No error or defect in any ruling or order or in anything done or omitted by the trial court of by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.

We agree that Dr. Letsinger's report contained an out-of-court statement offered to prove that Anderson's watering did not cause damage to the Residence and as such is inadmissible hearsay. However, Dr. Letsinger's testimony was admissible under Indiana Evidence Rule 703. We also note that Dr. Letsinger's report is a complex forty-four-page hydrologic analysis that she explained to the jury in her testimony. Without Dr. Letsinger's testimony, the average lay person could not begin to interpret these results. Further, contractor and home inspector Murrell identified the same maintenance issues with the Residence that could have caused water infiltration problems as Dr. Letsinger. Based on this evidence, we conclude that the trial court's admission of Dr. Letsinger's report constituted harmless error.

## Motion for Judgment on the Evidence

Kimbrough further argues that the trial court erred in denying his motions on the evidence as to Anderson's affirmative defenses. The purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence. *Zemco Mfg.,*

*Inc., v. Pecoraro*, 703 N.E.2d 1064, 1071 (Ind. Ct. App. 1998). The grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion. *Id.* Indiana Trial Rule 50(A) provides:

> Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

[38] When we review a trial court's ruling on a motion for judgment on the evidence, we are bound by the same standard as the trial court. *Faulk v. Nw. Radiologists, P.C.*, 751 N.E.2d 233, 238 (Ind. Ct. App. 2001) (citing *Campbell v. El Dee Apartments*, 701 N.E.2d 616, 619 (Ind. Ct. App. 1998)). We may not substitute our judgment for that of the jury on questions of fact nor should a motion for judgment on the evidence be granted because the evidence preponderates in favor of the moving party. *Id.* Rather we determine only: (a) whether there exists any reasonable evidence supporting the claim; and (b) if such evidence does exist, whether the inference supporting the claim can be drawn without undue speculation. *Id.*

*A. Affirmative Defense of Comparative Fault for Pre-Injury Conduct*

[39]     Specifically, Kimbrough argues that the evidence presented to the jury did not sufficiently show that Kimbrough unreasonably failed to avoid an injury or to mitigate damages before his injury, so Anderson should not have been able to assert comparative fault as a defense. He also argues that he had no way to avoid the water intrusion incidents allegedly caused by Anderson and that the prior water problems did not cause permanent or extensive damage to the Residence.

[40]     The Indiana Comparative Fault Act ("the Act") governs "any action based on fault that is brought to recover damages for injury or death to a person or harm to property." Ind. Code § 34-51-2-1. In an action based on fault that is brought against one defendant, the claimant is barred from recovery if the claimant's contributory fault is greater than the fault of all persons who fault proximately contributed to the claimant's damages. Ind. Code § 34-51-2-6(a)(1). For purposes of the Act under Indiana Code section 34-6-2-45(b),

> Fault includes any act or omission that is negligent, willful, wanton, reckless, or intentional toward the person or property of others. The term also includes unreasonable assumption of risk not constituting an enforceable express consent, incurred risk, and unreasonable failure to avoid an injury or to mitigate damages.

[41]     In *Kocher v. Getz*, our supreme court held that, "[i]n cases arising under the [Comparative Fault] Act, a defense of damages based on a plaintiff's acts or omissions occurring after an accident or initial injury is not properly included in

the determination and allocation of fault under the Act." 824 N.E.2d 671, 674 (Ind. 2005). Further, "[t]he phrase 'unreasonable failure to avoid an injury or to mitigate damages' included in the definition of fault under Indiana Code section 34-6-2-45(b) applies only to a plaintiff's conduct *before* an accident or initial injury. An example of such unreasonable failure to avoid an injury or to mitigate damages would be a claimant's conduct in failing to exercise reasonable care in using appropriate safety devices, e.g., wearing safety goggles while operating machinery that presents a substantial risk of eye damage." *Id.* at 674-75. Therefore, we will only consider the evidence presented relating to Kimbrough's pre-injury conduct to determine if the trial court properly denied Kimbrough's motion for judgment on the evidence on Anderson's comparative fault defense.

[42] The trial court admitted evidence from Kimbrough's 2006 home insurance claim file, indicating that the lower level of the Residence contained mold even before that water incident. Further, Anderson presented testimony from home inspector Murrell who explained that there were numerous maintenance issues with the Residence that could allow water to infiltrate into the wall and then into the foundation. Expert hydrogeologist Dr. Letsinger also attributed the cause of damage to the Residence to poorly installed drains around the perimeter or foundation of the house, lack of a sump pump, poor grading, or poorly maintained gutters. This evidence establishes that Kimbrough's omission *before* the alleged watering incidents occurred could have caused water intrusion in the lower level of the Residence. Based on all of this evidence, we conclude

that Anderson has presented reasonable evidence to support her comparative fault defense. Additionally, these inferences can be established without undue speculation.

*B. Affirmative Defense of Failure to Mitigate*

[43] Kimbrough further contends that Anderson failed to present evidence to support her failure to mitigate damages defense. He specifically asserts that Anderson failed to prove a separate, discrete, identifiable harm caused by Kimbrough's alleged unreasonable conduct or how much damage was caused or proximately caused by this unreasonable conduct.

[44] The obligation of a plaintiff to mitigate damages generally refers to the expectation that a person who has been injured should act to minimize damages after an injury-producing incident. *Kocher*, 824 N.E.2d at 674. The amount of damages a plaintiff is entitled to recover is reduced by those damages which reasonable care would have prevented. *Foster v. Owens*, 844 N.E.2d 216, 221 (Ind. Ct. App. 2006) (citing *Willis v. Westerfield*, 839 N.E.2d 1179, 1189 (Ind. 2006). The defense of failure to mitigate has two elements: (1) the defendant must prove that the plaintiff failed to exercise reasonable care to mitigate his or her post-injury damages; and (2) the defendant must prove that the plaintiff's failure to exercise reasonable care caused the plaintiff to suffer an identifiable harm not attributable to the defendant's negligent conduct. *Id.* It is not enough to establish that the plaintiff acted unreasonably. *Id.* The defendant must establish "resulting identifiable quantifiable additional injury." *Id.*

[45] In the record before us is evidence from Kimbrough's home insurance claim of a prior water incident in the lower level of the Residence that occurred in 2006. The cleaning and repair report indicated that mold was present before the 2006 incident. Further, Kimbrough consulted environmental consultant Dr. Simianu, who urged Kimbrough to identify the source of the moisture and remove it in 2008, after the first water intrusion at issue in this lawsuit occurred. Instead of following Dr. Simianu's recommendation, Kimbrough moved out of the Residence and did not remediate the damage.

[46] As a result, in 2012, the Residence was taken off of the Monroe County tax roll due to severe black mold damage. Kimbrough continued to travel and leave the Residence without supervision, even after being aware of the water intrusion problems, nor did he remove any of his personal belongings or sixty-three-piece art collection, allowing the items to be infiltrated by mold and essentially rendered valueless. When Dr. Simianu returned in 2013 and 2014, the damage had worsened significantly. He testified that it would now cost much more to remediate the mold damage than when he first collected air samples in 2008.

[47] Even though Dr. Simianu was Kimbrough's witness, his testimony established that Kimbrough failed to exercise reasonable care to mitigate post-injury damages and that Kimbrough's failure caused him to suffer an identifiable harm not attributable to Anderson's negligent conduct. Although Kimbrough cleaned up the lower level to the best of his personal ability, the problem needed to be remedied by completely removing the source of moisture and waterproofing his basement to eliminate future water infiltration problems.

[48] If Kimbrough had followed Dr. Siminau's recommendation, he would have likely not had to move out of the Residence and his art collection and personal property would not have been completely destroyed. What started out as a small mold problem turned into pervasive mold damage, evidenced by the Residence being removed from the tax roll. Even if Anderson's watering was determined to cause the water damage, Kimbrough's failure to at the very least remove his personal belongings and art collection caused him to suffer an identifiable harm not related to Anderson's conduct.

[49] Reasonable evidence supports Anderson's failure to mitigate defense and these inferences can be established without undue speculation. We therefore conclude that the trial court did not err when it denied Kimbrough's motion for judgment on the evidence in regard to both of Anderson's affirmative defenses. These issues were supported by sufficient evidence and the court properly left these questions of fact to the jury.

### Jury Instructions

[50] Kimbrough argues that the trial court erred in instructing the jury. The manner of instructing a jury is left to the sound discretion of the trial court. *Callaway v. Callaway*, 932 N.E.2d 215, 222 (Ind. Ct. App. 2010). Its ruling will not be reversed unless the instructional error is such that the jury misstates the law or otherwise misleads the jury. *Id.* Jury instructions must be considered as a whole and in reference to each other. *Id.* at 222-23. In reviewing a trial court's decision to give or refuse a tendered instruction, we consider: (1) whether the instruction

correctly states the law; (2) whether there is evidence in the record to support giving the instruction; and (3) whether the substance of the tendered instruction is covered by the other instructions that are given. *Id.* at 223. To determine whether sufficient evidence exists to support an instruction, we will only look to that evidence most favorable to the appellee and any reasonable inferences to be drawn therefrom. *Foddrill v. Crane*, 894 N.E.2d 1070, 1078 (Ind. Ct. App. 2008), *trans. denied.* Finally, "when a jury is given an incorrect instruction on the law, we will not reverse the judgment unless the party seeking a new trial shows 'a reasonable probability that substantial rights of the complaining party have been adversely affected.'" *Id.* (citations omitted).

*A. Final Instruction Number 8*

[51] Kimbrough argues that final instruction number 8 is an incorrect and incomplete statement of the law and is unsupported by the evidence. Instruction number 8 provided:

> Failure to avoid damages means the plaintiff's unreasonable failure to take some action that would have avoided the damage for which he complains. Plaintiff may not recover for any item of damage that could have been avoided through the use of reasonable care.

Appellant's App. p. 120.

[52] Although, we agree that final instruction number 8 on its own is an incomplete statement of the law regarding failure to mitigate, jury instructions must be

considered as a whole and in reference to each other. *Callaway*, 932 N.E.2d at 222-23. In final instruction number 11[11], the trial court instructed the jury:

> The Defendant bears the burden of proving both elements of the affirmative defense of post-injury failure to mitigate damages: (1) that the Plaintiff failed to exercise reasonable care to mitigate his or her post-injury damages, and (2) that the Plaintiff's failure to exercise reasonable care caused the Plaintiff to suffer an identifiable item of harm not attributable to the Defendant's negligent conduct.

Appellant's App. p. 123; Tr. p. 1150. One element that we must consider in our review is whether the substance of the tendered instruction is covered by the other instructions that are given. Taken together, we conclude that final instruction numbers 8 and 11 are a correct and complete statement of the law.

[53] Our more general discussion of the affirmative defense of failure to mitigate applies here, as well. *See supra* at pp. 20-23. For all of these reasons, final instruction number 8 was supported by sufficient evidence.

*B. Final Instruction Number 9*

[54] Similarly, Kimbrough asserts that final instruction number 9 is unsupported by the evidence. Instruction number 9 stated:

---

[11] In the transcript, the trial court did not assign numbers to the final instructions, but the instruction is labeled as such in Kimbrough's Appendix. *See* Appellant's App. p. 123; Tr. p. 1150.

The phrase "unreasonable failure to avoid an injury" applies to a claimant's conduct before an alleged incident. An example of unreasonable failure to avoid an injury would be a claimant's conduct in failing to exercise reasonable care in using appropriate safety devices, e.g. wearing safety glasses while operating machinery that presents a substantial risk of eye damage. If you find the Plaintiff committed some act or omission that constitutes unreasonable failure to avoid an injury then you should determine what percentage of fault should be allocated to Plaintiff.

Appellant's App. p. 121.

[55] As with final instruction number 8, our more general discussion of the affirmative defense of comparative fault for pre-injury conduct applies here. *See supra* at pp. 19-20. For the same reasons we concluded that the evidence evidence presented at trial was sufficient to support Anderson's comparative fault defense, and final instruction number 9 is likewise supported by sufficient evidence.

## Conclusion

[56] For all of these reasons, we conclude that the trial court did not abuse its discretion in precluding testimony from Anderson's insurance company regarding instructions given to Kimbrough, in admitting Kimbrough's prior home insurance claim file, and in admitting one of Anderson's expert reports into evidence. Further, the trial court did not abuse its discretion in denying Kimbrough's motion for judgment on the evidence on two of Anderson's

affirmative defenses or in instructing the jury with final instructions number 8 and number 9.

[57] Affirmed.

Vaidik, C.J., and Barnes, J., concur.