FILED

08/22/2017, 10:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANTS

Corinne R. Finnerty
McConnell Finnerty PC
North Vernon, Indiana

ATTORNEY FOR APPELLEE

Susan M. Salyer
Patsfall, Yeager & Pflum
Cincinnati, Ohio

# IN THE
# COURT OF APPEALS OF INDIANA

Robert Hrezo and Hrezo
Engineering, Inc.,

*Appellants-Plaintiffs,*

v.

City of Lawrenceburg,

*Appellee-Defendant.*

August 22, 2017

Court of Appeals Case No.
15A01-1612-CT-2957

Appeal from the Dearborn/Ohio
Circuit Court

The Honorable Jon W. Webster,
Special Judge

Cause No. 15C01-0607-CT-23

**Bradford, Judge.**

# Case Summary

Appellants-Plaintiffs Hrezo Engineering, Inc. ("HEI"), and Robert Hrezo (collectively, "Appellants") appeal from the judgment entered in favor of Appellee-Defendant the City of Lawrenceburg ("the City"). Robert established HEI in 1983 and, from at least 1997 until 2005, HEI worked on several construction projects for the City and/or its agencies, billing several million dollars over that period. In 2003, Tom Steidel began his tenure as City Manager, charged with assisting the mayor and the City's government.

Over the next couple of years, issues developed with HEI's work for the City, and several projects were terminated or suspended. Among the issues were concerns about possible overbilling and overstaffing and substandard work. In March of 2005, City Manager Steidel prepared a memorandum summarizing his concerns about HEI's work and distributed it to the Mayor, the City Council, the City's Clerk-Treasurer, and the City's Board of Works. Later in 2005, the decision was made to stop using HEI for City projects.

In 2006, Appellants sued the City, alleging tortious interference, defamation, interference with prospective business advantage, and violations of Indiana's RICO statutes. Ultimately, the trial court granted summary judgment in favor of the City on the tortious interference, interference with prospective business advantage, RICO, and defamation *per se* claims, leaving defamation *per quod* the only claim remining for trial. Following trial, the jury returned a verdict in favor of the City, and the trial court denied Appellants' motion to correct error.

[4]     Appellants contend that the trial court erred in (1) granting summary judgment in favor of the City on Appellants' defamation *per se* claim, (2) granting summary judgment in favor of the City on Appellants' tortious interference claim, (3) excluding proffered testimony regarding Appellants' alleged damages, (4) refusing to deliver Appellants' proposed jury instruction on publication, and (5) refusing to include several allegedly defamatory statements on a verdict form given to the jury. Because we conclude that Appellants' claims are without merit, we affirm.

## Facts and Procedural History

[5]     Robert is the sole owner of HEI, which he established in 1983 and whose operations he oversees. In 1997, Robert was appointed City Engineer for the City, and HEI worked on approximately ninety-five projects for the City from 1997 to 2005, including such projects as the Lawrenceburg Police Station, three swimming pools, and work on the Lawrenceburg levy system. Altogether, HEI billed the City over $3.5 million from 1997 to 2005. During this time, Appellants also worked with Mel Davis, the City's utilities director.

[6]     On January 1 or 2, 2003, City Manager Steidel began his tenure. City Manager Steidel's job was to bring a "professional management process as a proponent to the City [and] assist the Mayor, and the Council[.]" Tr. Vol. II p. 136. City Manager Steidel was supposed to "manage contracts that the City was engaged in and in some cases develop contracts that the City would enter into." Tr. Vol. II p. 136. In November of 2003, William Cunningham was elected Mayor of

the City and took office on January 1, 2004. On the first day of Mayor Cunningham's tenure, City Manager Steidel decided that he was terminating or putting on hold fifteen of HEI's thirty-three to thirty-five ongoing projects.

[7] Among the projects HEI worked on for the City was Todd-Creech Park, which was a drainage basin that was to be converted into a recreational area. At the time, Mario Todd was an independent contractor working with HEI. Todd served as an inspector on the Todd-Creech project along with another inspector from HEI. City Manager Steidel told Robert that he only wanted one inspector on the Todd-Creech jobsite, because, in City Manager Steidel's view, the park was not large enough to require two inspectors and there were "a lot of days I went over there, there was very little going on." Tr. Vol. II p. 142. City Manager Steidel also told Hrezo to begin bringing one representative to Todd-Creech construction meetings when he had been bringing up to five. Director of engineering for the City Michael Clark noted later that there had been problems with HEI's work on the Todd-Creech project, including "major de-watering issues" caused by a breached aquifer and baseball field that would not drain properly because it had been designed "table top flat[.]" Tr. Vol. II p. 119.

[8] In 2004, Todd was working with HEI performing inspections on City building projects, including those worked on by a company called Fortune Management, which was working with the City's redevelopment commission to rehabilitate and sell older structures. In early 2004, it came to Todd's attention that there were questions about one particular project that HEI had approved. HEI had

issued an American Institute of Architects ("AIA") document for a house on 19 Williams Street in the City indicating that new windows and cabinets had been installed. The address, however, was an empty lot. When Todd confronted Robert and his son Mike about the AIA document, Robert told him that City Manager Steidel had told him to sign it. Todd resigned from HEI that day and was later hired by the City to perform in-house inspections.

[9] On March 3, 2005, in anticipation of an executive session meeting at which Robert was expected to complain about his mounting issues with the City, City Manager Steidel issued a memorandum to Mayor Cunningham, the City Council, the City's Clerk-Treasurer, and the Board of Works ("the Steidel Memo"), which provides, in relevant part, as follows:

> To: Mayor & City Council, Clerk-Treasurer, Bd. Of Works
>
> From: Tom Steidel, City Manager
>
> Date: March 3, 2005
>
> Subject: Hrezo Engineering Billing Issues
>
> I must apologize for being absent for Tuesday night's X-session but the beaches call. Mr. Hrezo is appearing before Council & The Board of Works to protest what he says is my refusal to pay his firm for services rendered. That is not exactly the case. I have called in to question several of his bills to the city while promptly paying others. I have asked him to consider amending some of his billings to reflect problems on the job that his firm has some responsibility for. So far he has failed to do so.
>
> Mr. Hrezo and I have been having discussions for quite some time about his billing tendencies. First he bills quarterly instead of monthly and only recently has submitted time cards.

Unfortunately, the review of the time cards only reinforces my view that he deploys way more employees to our jobs than is warranted. Todd[-]Creech Park is a classic example where he has insisted on deploying two inspectors day after day after day. The park just isn't big enough to warrant that level of coverage nor was a lot of work being done. Sometimes there was none at all but the inspectors were there.

Mr. Hrezo bills out his inspectors at $55 per hour I believe and pays approximately $25 per hour. For two inspectors at those rates Hrezo Engineering would collect $60 for every hour the two inspectors were deployed. In addition, he has continued to bring as many as five (5) persons to our construction meetings. I have discussed these issues with Mr. Hrezo on numerous occasions and I guess his most common response is that he needs these resources to get his work done.

We have paid Hrezo engineering a total of $335,029 during 2004 including a December bill for $86,141 for work on Todd-Creech Park. We now have a February bill for $51,577. The make up of those bills is as follows:

December Billing

| | | | |
|---|---|---|---|
| Principal Engineer | 179.50 hrs | @ $85 Hr. | $15,257.50 |
| Chief Engineer | 397.50 hrs. | @$75 Hr. | $29,812.50 |
| Engineer 2 | 150 hrs. | @$65 Hr. | $9750.00 |
| Senior Field Tech | 477.5 hrs. | @355 Hr. | $26262.50 |
| Technician 2 | 51 hrs. | @$50 Hr. | $2550.00 |
| Structural Consult | 22.50 hrs. | @5595 HI. | $2,137.50 |
| Structural Consult | 3 hrs. | @$113 Hr. | $339.00 |
| UPS Charges | | | $32.40 |
| | | Total | $86,141.40 |

As I analyze this I have to wonder why we are still paying these huge engineering and design charges ($57,295) when the design was done a year ago. This billing period was for 82 days.

The February bill for Todd-Creech, covering only 64 days is $51,577. This bill contains 420 hours of Senior Field Inspection and 40.75 hours of Technician 2 time. Engineering services appear to cost $26,439. I remind [you] that this is a project that was basically designed in 2003 and supposed to be constructed in 2004. Here we are in 2005 still paying for engineering services. I suspect that many of these engineering hours are to re-engineer, correct, add to, or amend his original plan. If that is true, Hrezo Engineering should take some responsibility for these expenses.

In addition to the above bills Hrezo Engineering also billed the contractor for an additional $8000 for capping the w[e]lls at Todd-Creech Park. The contractor has refused to pay the bill and I assume it will fall to us if it is not paid. There were engineers with the well-capping companies and H.C. Nutting was the engineer in charge. I'm not exactly sure what Hrezo Engineering was doing for $8000.

The Fire Station is another project that I asked Mr. Hrezo for clarification. Our bill for the December billing was $7141.75 of which $6333 was for engineering services and $440 for inspection. The February bill was for $2462 all of which appear to be engineering services. I had returned the December bill and asked Mr. Hrezo to critically review it. As you know we have some construction issues at this location. Problems such as the truss welds which I believe we are being charged to have Hrezo inspect when we have previously paid his inspector to been the site, and inspecting, the truss installation. We should not have to pay again.

There were several other December bills that I questioned which have since been paid.

Recently I received a bill for $18,492.94 for the Ivy Tech Retaining Wall. This invoice covers the period from 1/5/04 thru 2/10/05. This billing is unusually [sic] since it covers 13 months as opposed to the normal quarterly billing cycle. This project was finished as of 12/31/03 when I told both the contractor Roy

A. Miller and Mr. Hrezo that work must stop as the project appeared to be finished.

Since that time you may know that there are problems with the wall. I did not authorize Hrezo Engineering to do $18,492 worth of work on this project and have no clue what they accomplished except to throw the blame for the wall problems on others. It is a fact that the wall is failing to some degree and Hrezo Engineering was the principle [sic] representative of the City of Lawrenceburg. For him to fail to accept some measure of responsibility for this problem seems odd.

Lately what I have asked Mr. Hrezo is to try to explain to me what work he has done that actually accomplishes objectives for the city. On all three of these projects, there is difficulty seeing any real production for the amount of money we are paying. The Fire Station continues to be a problem. Todd-Creech Park speaks for itself and the Ivy Tech wall problem could dwarf the other two issues in financial impact.

Finally, I am ending our association with Hrezo Engineering on the Rte. 50 Gateway project. A review of the plans indicate that the project scope has gotten larger than what is appropriate. Therefore, after in-house discussion with Mike Clark, Mario Todd and Mel Davis, we have decided to handle the project in-house. Hrezo Engineering will be paid for the work they have done up to this point.

I would suggest that any further work with Hrezo Engineering be assigned in writing and be very task and objective oriented. I would also put "not to exceed numbers" into the contract to guard against the kind of problems we are having on the three jobs outlined above. I have asked for additional, subjective information regarding these three projects and as of yet I haven't been given anything that would change my mind that the numbers submitted are too high[.]

Appellant's App. Vol. II 137–39.

[10]     In July of 2005, City Manager Steidel allegedly stated in a City Council meeting that HEI did "bad work." Tr. Vol. I p. 205. In August of 2005, after a development deal with the City for the renovation of a City-owned building fell through, Robert filed an unrelated complaint against the City. At that point, Clark decided to stop using HEI for any City projects.

[11]     On July 3, 2006, Appellants filed suit against the City, alleging tortious interference, defamation, interference with prospective business advantage, and violations of Indiana's RICO statutes. On September 30, 2009, the City moved for summary judgment. On June 30, 2011, the trial court granted summary judgment in favor of the City on the tortious interference, interference with prospective business advantage, and RICO claims. On January 13, 2012, the City filed a second summary judgment motion. On March 9, 2012, the trial court granted the City's summary judgment motion as it pertained to Appellants' claim of defamation *per se*, leaving defamation *per quod* the only claim remining for trial.

[12]     On March 19, 2012, the City filed a motion in limine seeking to exclude testimony concerning the amount of HEI's damages based on past income received from the City. On September 6, 2016, the trial granted the City's motion in limine in part "to the extent Plaintiffs intend to present evidence, written and oral, from anyone other than Mr. Robert Hrezo." Appellant's App. Vol. IV p. 196.

[13]     Jury trial was held on September 19, 20, 22, 23, and 26, 2016. During trial, Appellants made an offer of proof of testimony and a report prepared by CPA John Race regarding Appellants' claimed damages. Appellants also tendered a proposed verdict form, which included nineteen allegedly defamatory statements for consideration by the jury. The trial court omitted ten of the nineteen statements from the verdict form. Appellants also tendered an instruction on publication which the trial court declined to give. On September 26, 2016, the jury returned a verdict in favor of the City, finding that none of the communications about which it had been instructed were defamatory. The jury indicated its findings on the verdict form by circling "NO" for each of the communications:

> If you decide in favor of Hrezo Engineering, Inc., indicate the specific find to communications that you be defamatory by circling YES to indicate that you do find the communication to be defamatory or NO to indicate that you do not find the communication to be defamatory:
>
> YES  NO   1. March 3, 2005 Memo ("memo"): "I have asked him to consider amending some of his billings to reflect problems on the job that this firm has some responsibility for. So far he has failed to do so."
>
> YES  NO   2. Memo: "Unfortunately, the review of the time cards only reinforces my view that he deploys way more employees to our jobs than is warranted. Todd Creech Park is a classic example where he has insisted on deploying two inspectors day after day after day. The park just isn't big enough to warrant that level of coverage nor was a lot of Work being done. Sometimes there was none at all but the inspectors were there."

YES  NO    3. Memo: "Problems such as the truss welds which I believed we are being charged to have Hrezo inspect when we have previously paid his inspector to be on the site, and inspecting, the truss installation. We should not have to pay again."

YES  NO    4. Memo: "On all three of these projects, there is difficulty seeing any real production for the amount of money we are paying. The Fire Station continues to be a problem. Todd-Creech Park speaks for itself and the Ivy Tech wall problem could dwarf the other two issues in financial impact."

YES  NO    5. Tom Steidel reported $1,517,432.28 in additional charges at the December 13, 2004 MDF budget work session regarding the Ludlow Hill Street project.

YES  NO    6. March 3, 2005 Memo: "As I analyze this I have to wander why we are still paying these huge engineering and design charges ($57,295) when the design was done a year ago. The billing period was for 82 days."

YES  NO    7. In a July 5, 2005 meeting of the City Council Tom Steidel stated in the presence of other Council members that Hrezo Engineering did bad work.

YES  NO    8. Hrezo Engineering was accused of calling FEMA. Hrezo denies making the call.

YES  NO    9. Mario Todd, Tom Steidel and Mel Davis all accused Hrezo Engineering of performing bad work at Todd-Creech Park. Hrezo denies this accusation.

[14]    Appellant's App. Vol. II p. 42. On October 25, 2016, Appellants filed a motion to correct error, which the trial court denied on November 30, 2016.

# Discussion and Decision

Appellants contend that the trial court erred in (1) granting summary judgment in favor of the City on Appellants' defamation *per se* claim, (2) granting summary judgment in favor of the City on Appellants' tortious interference claim, (3) excluding Race's testimony regarding Appellants' alleged damages, (4) refusing to deliver Appellants' proposed jury instruction on publication, and (5) refusing to include several allegedly defamatory statements on the verdict form.

### Standard of Review for Denial of Motion to Correct Error

Appellants appeal from the trial court's denial of their motion to correct error.

> In general, we review a trial court's ruling on a motion to correct error for an abuse of discretion. *Hawkins v. Cannon*, 826 N.E.2d 658, 661 (Ind. Ct. App. 2005), *trans. denied*. However, to the extent the issues raised by the City are purely questions of law, our review is de novo. *See Ind. BMV v. Charles*, 919 N.E.2d 114, 116 (Ind. Ct. App. 2009) ("Although rulings on motions to correct error are usually reviewable under an abuse of discretion standard, we review a case de novo when the issue … is purely a question of law.")[.]

*City of Indpls. v. Hicks*, 932 N.E.2d 227, 230 (Ind. Ct. App. 2010), *trans. denied*. Standards of review applicable to Appellants' specific claims will be noted in the appropriate section.

### Standard of Review for Issues I and II

In issues I and II, Appellants contend that the trial court erred in granting summary judgment in favor of the City.

When reviewing a grant or denial of a motion for summary judgment our standard of review is the same as it is for the trial court. *Kroger Co. v. Plonski*, 930 N.E.2d 1, 4 (Ind. 2010). The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 (Ind. 2012). Summary judgment is improper if the movant fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* In determining whether summary judgment is proper, the reviewing court considers only the evidentiary matter the parties have specifically designated to the trial court. *See* Ind. Trial R. 56(C), (H). We construe all factual inferences in the non-moving party's favor and resolve all doubts as to the existence of a material issue against the moving party. *Plonski*, 930 N.E.2d at 5. The fact that the parties have filed cross-motions for summary judgment does not alter our standard for review, as we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Hardy v. Hardy*, 963 N.E.2d 470, 473 (Ind. 2012).

*Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012).

# I. Defamation

[4]     Appellants argue that the trial court erred in granting summary judgment in favor of the City on their claim of defamation *per se*.

To establish a claim of defamation, a "plaintiff must prove the existence of 'a communication with defamatory imputation, malice, publication, and damages.'" *Trail v. Boys & Girls Clubs of N.W. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006) (quoting *Davidson v. Perron*, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999), *trans. denied*). A statement is defamatory if it tends "to harm a person's reputation by lowering the person in the community's estimation or

deterring third persons from dealing or associating with the person." *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007) (internal citation omitted). One type of defamation action, alleging defamation *per se*, arises when the language of a statement, without reference to extrinsic evidence, constitutes an imputation of (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct. *Id.*; *see also Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992), *trans. denied*; *Elliott v. Roach*, 409 N.E.2d 661, 683 (Ind. Ct. App. 1980), *trans. not sought*. In contrast, if the words used are not defamatory in themselves, but become so only when understood in the context of extrinsic evidence, they are considered defamatory *per quod*. *McQueen v. Fayette County Sch. Corp.*, 711 N.E.2d 62, 65 (Ind. Ct. App. 1999), *trans. denied*. In actions for defamation *per se*, damages are presumed, but in actions for defamation *per quod*, a plaintiff must prove damages. *Rambo*, 587 N.E.2d at 145–46.

*Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010). "Whether a communication is defamatory is a question of law for the court, unless the communication is susceptible to either a defamatory or non-defamatory interpretation-in which case the matter may be submitted to the jury." *Baker v. Tremco Inc.*, 917 N.E.2d 650, 657 (Ind. 2009).

Appellants argue that designated statements, including many drawn from the Steidel Memo, are *per se* defamatory. Appellants, however, do not identify any specific statements in their argument, noting only that "[t]he statements made by Steidel and others all related to Hrezo's work for the City and falsely accused Hrezo of overcharging; using more workers than were necessary; being responsible for problems with the Ivy Tech wall; inappropriately expanding the scope of the Gateway project and doing unnecessary work." Appellant's Br. p.

28. Even assuming that such statements were made and that Appellants accurately characterize them, none of the above amounts to defamation *per se*. Put another way, none of the above constitutes an allegation of misconduct on its face, as all of it could just as easily have been caused by mistake or incompetence. Put another way, Appellants would have to depend on extrinsic evidence to establish that any of the above was defamatory, rendering it, at best, defamation *per quod*. The trial court did not err in this respect.

## II. Tortious Interference

[6] Appellants also contend that the trial court erred in entering summary judgment in favor of the City on their tortious interference claim. Specifically, they argue that a utility service board is a separate entity from a municipality under Indiana law, they did work for the City's utility service board, and several City agents interfered with that work.

> The elements of an action for tortious interference with a contract are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach.

*Levee v. Beeching*, 729 N.E.2d 215, 221 (Ind. Ct. App. 2000). However, "[a] party cannot 'interfere' with its own contracts, so the tort itself can be committed only by a third party." *Trail*, 845 N.E.2d at 138.

[7] The City argues that Appellants raise this issue for the first time on appeal. It is well-settled that "[i]ssues not raised before the trial court on summary judgment

cannot be argued for the first time on appeal and are waived." *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 387 (Ind. Ct. App. 2004). Appellants' claim that they did work for the City's utility service board was not raised or litigated below and is consequently waived for appellate consideration.

## III. Exclusion of Expert Testimony

[8] Appellants contend that the trial court abused its discretion in excluding the testimony of Race regarding their claimed damages.

> The admission and exclusion of evidence falls within the sound discretion of the trial court, and this court reviews those decisions only for an abuse of that discretion. *See Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Carpenter v. State*, 786 N.E.2d 696, 702–03 (Ind. 2003). When we review for an abuse of discretion, we do not reweigh the evidence. *K.S. v. Marion County Dep't of Child Servs.*, 917 N.E.2d 158, 162 (Ind. Ct. App. 2009).

*Brightpoint, Inc. v. Pedersen*, 930 N.E.2d 34, 38 (Ind. Ct. App. 2010), *trans. denied*.

[9] We conclude that any error the trial court may have made in excluding Race's evidence was harmless. "An error is harmless when the probable impact of the erroneously admitted or excluded evidence on the factfinder, in light of all the evidence present, is sufficiently minor so as not to affect a party's substantial rights." *Kimbrough v. Anderson*, 55 N.E.3d 325, 334 (Ind. Ct. App. 2016), *trans. denied*. Quite simply, the question of damages was rendered moot by the jury's finding that none of statements alleged to be defamatory by Appellants were, in

fact, defamatory.  Without defamation, there can be no damages, rendering any evidence relating to the question, which would have included Race's testimony and report, irrelevant.

# IV.  Jury Instructions

Appellants contend that the trial court abused its discretion in declining to give a tendered jury instruction on publication.

> The giving of jury instructions is a matter within the sound discretion of the trial court, and we review the trial court's refusal to give a tendered instruction only for an abuse of that discretion. *See Control Techniques, Inc. v. Johnson*, 737 N.E.2d 393 (Ind. Ct. App. 2000), *trans. pending*.  Such an abuse of discretion occurs only when:  1) the instruction correctly states the law; 2) the evidence supports the instruction; and 3) the substance of the instruction is not covered by other instructions.  *Id.*  Further, even if refusal of a tendered instruction is error, we will not reverse unless the failure to give the instruction substantially and adversely affected the party's substantial rights so as to likely have affected the result.  *Epperly v. Johnson*, 734 N.E.2d 1066 (Ind. Ct. App. 2000).

*Merida v. Cardinal*, 749 N.E.2d 605, 607 (Ind. Ct. App. 2001).

Appellants proffered the following jury instruction on publication:

> The communication within the scope of his employment by one (1) agent to another agent of the same principal is a publication by the principal.  Evaluation information communicated within the City of Lawrenceburg to management personnel may be considered published for purposes of this action.

Tr. Vol. III pp. 70–71.

[12] While we agree with Appellants that publication (for purposes of defamation) can occur between agents of the same principal, *see, e.g.*, *Bals v. Verduzco*, 600 N.E.2d 1353, 1355 (Ind. 1992) ("When intracompany communications injure an employee's occupational reputation, the result may be among the most injurious of defamations."), that does not help them here. As mentioned, the jury specifically found that none of the statements submitted to it were defamatory, so it matters little who communicated them to whom. Even if we assume, *arguendo*, that the proffered instruction was proper, any error the trial court may have committed in this regard can only be considered harmless. *See, e.g.*, *Kimbrough*, 55 N.E.3d at 334.

## V. Allegedly Defamatory Statements

[13] Appellants contend that the trial court abused its discretion in refusing to include six additional, allegedly defamatory statements on the verdict form, which, as given to the jury, contained nine.

> It is a question of law for the court to decide whether a statement considered in its entirety is capable of possessing a defamatory meaning or implication. [*Woods v. Evansville Press Co.*, 791 F.2d 480, 485 (7th Cir. 1986)] (citing *Rose v. Indianapolis Newspapers, Inc.*, 213 F.2d 227, 229 (7th Cir.1954)). If a statement is susceptible to both defamatory and non-defamatory meanings, the matter of interpretation should be left to the jury. *Id.* In order to impose liability for defamation, the United States Constitution requires a false statement of fact. [*Heeb v. Smith*, 613 N.E.2d 416, 421 (Ind. Ct. App. 1993) (citing *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed.2d 41 (1988)), *trans. denied*.]

*Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 457 (Ind. 1999). We address the allegedly defamatory statements in turn.

## A. Statement #3

> 3.     Memo: Ivy Tech retaining wall; ["]I did not authorize Hrezo Engineering to do $18,492 worth of work on this project and have no clue what they accomplished except to throw blame for the wall problems on others."…. Memo: "For him to fail to accept some measure of responsibility for this problem seems odd."

Appellant's App. Vol. II pp. 68.

Robert himself testified that City Manager Steidel told him to stop work on the Ivy Tech wall but that he did not. Robert also testified that he learned at some point that another company who issued an incorrect report on pressures exerted on the wall from soil was felt to be responsible for design problems with the wall and admitted that he brought that to the City's attention. In other words, Appellants did, in fact, "throw blame" on others for problems with the wall. Robert also admitted that he did not accept responsibility for problems with the wall, testifying that "[w]e had no[] responsibility for those failures." Tr. Vol. I p. 188. Steidel's statement that this refusal seemed "odd" is an opinion that is not capable of being false.

## B. Statement #5

> 5.     Memo: "In addition to the above bills Hrezo Engineering also billed the contractor for an additional $8,000 for capping the w[e]lls at Todd-Creech Park.["]

Appellant's App. Vol. II pp. 68.

Robert testified that he did, in fact, bill this amount for capping the wells at Todd-Creech Park, saying, "We turned the bill over to the contractor who refused to pay it." Tr. Vol. I p. 177. Robert conceded that this statement was not false.

## C. Statement #9

9.      Memo: re: Gateway; "A review of the plans indicate that the project scope has gotten larger than what is appropriate."

Appellant's App. Vol. II pp. 68.

We conclude that this statement is far too vague to be defamatory. It is sufficient to note that it does not identify a cause for the enlargement of the Gateway project's scope, much less attempt to blame Appellants.

## D. Statements #17 and #18

17.      July 11, 2005 minutes of the meeting of the Lawrenceburg Redevelopment Commission. Page 3, Tom Steidel represents to the Commission and others at the meeting that Bob Hrezo has "no absolute plans", that he "keeps changing his deals" and that "he was okay with $21,000.00 for the roof repair and now he wants more." Bob Hrezo will testify that those representations were false and that Mr. Steidel was well aware of their falsity.

18.      July 27, 2005 minutes of the meeting of the Lawrenceburg Redevelopment Commission, Page 4, Mr. Steidel once again misrepresented concerning the roof at McCullough Drug Building and the $21,000.00 cost for the roof repair. Bob Hrezo was present at the meeting when this was presented to the Commission.

Appellant's App. Vol. II pp. 69.

The above apparently relates to the redevelopment project that gave rise to the unrelated lawsuit Appellants filed against the City in 2005. *See Hrezo v. City of Lawrenceburg*, 934 N.E.2d 1221, 1226 (Ind. Ct. App. 2010), *trans. denied*. As the City points out, however, the minutes of the City's Redevelopment Commission were not entered into evidence during *this* trial. The only evidence at all relating to a $21,000 payment for roof repair was the following exchange during Robert's testimony:

> [Appellants' Counsel]. The issue was with regard to the roof and in one (1) of the statements that Mr. Steidel made about the roof during a meeting of the LRC (Lawrenceburg redevelopment)[.] [W]hat was false about that statement that he made in that public meeting?
>
> [Robert]. That the twenty-one thousand ($21,000) dollars for the roof had been on all the development agreements to this point, which was incorrect, it only came up on the development agreement.

Tr. Vol. I p. 209. This evidence falls far short of supporting the inclusion of statements 17 and 18 on the verdict form.

## E. Statement #19

19. Memo from Tom Steidel to Bob Hrezo dated September 16, 2005. Mr. Steidel questions an invoice for Roy A. Miller & Sons, dated January, 2004. Mr. Steidel states the following:

> "I am not sure why you would approach us at this late date to pay this amount. In addition, you have billed us for $127.50 which I assume relates to preparing this bill. That sum cannot be paid either since the work cannot be verified."

Appellant's App. Vol. II pp. 69.

[23] Put simply, the proffered statement indicates that it is taken from a memorandum from City Manager Steidel to Robert, and there is no evidence that anyone else received it. Because there is no evidence of publication, inclusion of the statement was not supported by the record. Appellants have failed to establish that the trial court erred in refusing the include the six proffered statements on the verdict form.

# Conclusion

[24] We conclude that the trial court did not err in granting summary judgment in favor of the City on Appellants' tortious interference and defamation *per se* claims. We further conclude that the trial court did not abuse its discretion in disallowing Race's proffered evidence on damages and that any error it may have committed in instructing the jury on publication can only be considered harmless. Finally, we conclude that the trial court did not err in refusing the include six allegedly defamatory statements on the verdict form distributed to the jury.

[25] We affirm the judgment of the trial court.

May, J., and Barnes, J., concur.