

FILED

Jun 19 2019, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Crystal G. Rowe
New Albany, Indiana

Michael Wroblewski
Adam S. Ira
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Marc S. Sedwick
New Albany, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Golden Corral Corporation, *Appellant-Defendant,* v. Kristina M. Lenart, *Appellee-Plaintiff* | June 19, 2019 Court of Appeals Case No. 18A-CT-704 Appeal from the Clark Circuit Court The Honorable Vicki L. Carmichael, Judge Trial Court Cause No. 10C04-1310-CT-183 |

**Altice, Judge.**

## Case Summary

[1]     Golden Corral Corporation appeals following a jury verdict and $240,000 award of damages in favor of Kristina M. Lenart on Lenart's claim for

negligence in which Lenart alleged that Golden Corral failed to prepare and serve its barbeque chicken wings in a manner safe for human consumption and that as a result of consuming such chicken wings, Lenart suffered from food poisoning and related injuries. On appeal, Golden Corral presents four issues for our review:

> 1. Did the trial court abuse its discretion in allowing Dr. Julie Hutchinson to testify as an expert witness on Lenart's behalf?
>
> 2. Did the trial court abuse its discretion in denying Golden Corral's motions for judgment on the evidence?
>
> 3. Did the trial court abuse its discretion by instructing the jury on spoliation and *res ipsa loquitur*?
>
> 4. Did the trial court err in concluding that Lenart's claim was not governed by the Indiana Products Liability Act (IPLA)?

We affirm.

## Facts & Procedural History

On Sunday, April 28, 2013, Lenart, her husband Kenneth, and their twelve-year-old daughter went to the Golden Corral restaurant in Clarksville, Indiana. When they arrived at the restaurant at approximately 1:00 p.m., there was a line at the front register and after they paid, they had to wait about ten minutes until a table became available. Lenart and her family then proceeded to the buffet.

[4]     When Kenneth grabbed a plate, he saw that there was food stuck between two plates and brought it to the attention of a Golden Corral employee. He then grabbed another plate and started choosing food items. As he walked down the buffet line, Kenneth noted that "the amounts of food were kinda slim-pickin's" and most of the food bins were "down to a bare minimum" with some bins completely empty of food. *Transcript Vol. 2* at 239. He overheard an employee apologizing to patrons and advising that it could take up to thirty to forty minutes for food on the buffet to be replenished because they had been "slammed" with customers. *Id.* Kenneth then returned to the table. Because he did not get all the food he wanted on his first trip to the buffet, Kenneth continued to watch the buffet line to see when additional food was brought out. He described the circumstances as a "feast or famine type of thing," noting that "[e]very time that a tray of food was brought out it was kind of like . . . steel to a magnet, everybody just converted [sic] on it, . . . they wanted their food." *Id.* at 242.

[5]     During her first trip to the buffet, Lenart chose bone-in, barbeque chicken wings, mashed potatoes, and a slice of pizza and then returned to the table with her family. As she ate the wings, she did not perceive any problems or note that they were pink or undercooked. On her second trip to the buffet, Lenart grabbed about ten more barbeque chicken wings and ate all but a couple.

[6]     Lenart's daughter went through the buffet line three times, and on her third trip she opted for plain, bone-in chicken wings, which were in a tray separate from the barbeque chicken wings. After she bit into her first plain chicken wing,

Kenneth "noticed it was like blood raw, it wasn't just pink, . . . it was raw." *Id.* at 244. Kenneth told her to stop eating her plain chicken wing and then he took it to the register and demanded to speak with a manager. While he was speaking with the manager, another female patron approached and "went off on the manager" about her chicken being raw.[1] *Transcript Vol. 3* at 3. The manager immediately offered Kenneth a refund, which Kenneth accepted. The manager then threw away the plain chicken wing that Kenneth brought to his attention.

[7] Lenart and her family left Golden Corral without finishing their food. They went to a nearby Lowe's home improvement store, where they shopped for approximately thirty to forty-five minutes before making the twenty-minute drive home. During this time, Lenart was feeling fine. Shortly after returning home, while she was preparing to plant flowers outside, Lenart suddenly started feeling sick and had to walk "real fast like a run" to the bathroom. *Id*. at 6. Lenart first had diarrhea and then she experienced intense vomiting. These symptoms appeared approximately one to two hours after Lenart left Golden Corral. Neither Kenneth nor Heather experienced any illness or adverse symptoms.

---

[1] Kenneth did not know what type of chicken the customer was complaining about—whether it was a chicken breast, thigh, or wing.

[8] Later that evening, Kenneth took Lenart to the emergency room. Because she was not treated promptly, Kenneth took her to a second emergency room where she remained overnight. The following morning, Lenart was released.

[9] On May 7, 2013, Lenart followed up with a family doctor with continued complaints of abdominal pain, nausea, and vomiting. Lenart was referred to a gastroenterologist, who, after an evaluation on May 28, 2013, referred her to Dr. Julie Hutchinson, a board-certified general surgeon. Dr. Hutchinson evaluated Lenart on May 31, 2013, at which time Lenart complained of continued abdominal pain and told Dr. Hutchinson that she was not able to keep food down. Dr. Hutchinson determined that Lenart had an umbilical hernia that required surgery, which Dr. Hutchinson performed on June 5, 2013.

[10] After the surgery to repair the umbilical hernia, Lenart continued to complain of abdominal pain and nausea, leading to two additional surgeries to repair scar tissue that had formed at the first surgical site. Dr. Hutchinson believes Lenart might require additional surgeries in the future. Prior to this health incident, Lenart never had problems with her gallbladder, gastritis, pancreatitis, or vomiting. In the six months preceding her visit to Golden Corral, Lenart had not experienced any issues with heartburn or gastroesophageal reflux.

[11] With regard to Golden Corral's food preparation, when Golden Corral receives its chicken wings from its distributor, the wings are raw and cold, but not frozen. Golden Corral's procedure for preparing the chicken wings is that the wings are cut into three pieces at the joints and the wing tips are discarded. The

wings are cooked in a deep fryer at a temperature of 350 degrees for eight and a half minutes and then drained for 10 to 30 seconds. For barbeque chicken wings (as well as other types of flavored chicken wings), the fried wings are placed in a pan and heated sauce is poured over them. The wings are then transferred to an appropriate bin and placed on the buffet. Each different flavor of chicken wings is contained in its own separate bin, and each bin has its own dedicated tongs.

[12] Golden Corral also has a procedure for ensuring that the food on its buffet is maintained at a temperature outside the "danger zone"—which refers to the temperature range that promotes the growth of bacteria.[2] *Id*. at 103. Four times a day (at 11 a.m., 2 p.m., 4 p.m., and 8 p.m.), Golden Corral takes the temperature of food on the buffet and the temperatures are noted in a temperature log. It is Golden Corral's policy that the buffet temperature logs are kept for ninety days, after which they are replaced with new temperature logs over the course of the next ninety-day period. In the case of chicken wings, the temperature is taken of individual chicken wings on the buffet. These logs do not provide information about how the food was prepared or cooked. Golden Corral does not have a corollary procedure for taking the temperature of food once it is cooked. Rather, the food is simply prepared and cooked according to the specified procedures. As pertinent here, Golden Corral did not

---

[2] William Scheibe, whose title was New Store Opening Specialist for Golden Corral at the time he provided his deposition testimony, testified that food is allowed to be in the danger zone for a period of four hours, during which time frame the food "will not develop enough bacteria to be of a harmful nature." *Id*. at 103.

preserve the buffet temperature logs of the chicken wings for the day Lenart visited the Clarksville location after the expiration of the ninety-day retention period.

[13] With respect to food items that are returned or about which a complaint is made, Golden Corral did not, at all times relevant to this case, have a policy requiring preservation of such items. Generally speaking, a food item about which a patron complains would only be saved if the manager was directed to do so or if there is a confirmed form of contamination. Undercooked food is typically disposed of because there is no reason to keep it.

[14] On April 30, 2013, two days after their visit to Golden Corral, Kenneth accessed Golden Corral's corporate website and submitted the following complaint:

> We visited your Clarksville, IN location Sunday – THE CHICKEN BEING SERVED WAS BLOOD RAW –There was no ham, sausage, pizza, taco meat, meatloaf, chocolate in the wonderfall and the deserts [sic] were at a bare minimum – This place was pushing out RAW food and telling people it will be a 30-40 minute wait. The food was being pushed out without ample cooking time. My wife ended up with food poisoning and spent the night in a hospital from eating undercooked wings and chicken. I spoke with two managers and pointed these tings [sic] out and neithor [sic] of them seemed like they were very concerned about it. Other diners were complaining as well about the chicken being undercooked. I would like someone to contact me on this issue.

*Exhibits Vol. 6, Plaintiff's Exhibit 1* at 4-5. Golden Corral responded to Kenneth's message on May 3, 2013, advising that his concerns had been forwarded to the District Manager for corrective action. Kenneth also received a call from a representative of Golden Corral assuring him that the matter was being investigated and that it was being taken "very serious." *Transcript Vol. 3* at 17. Subsequently, at the direction of the district manager, Golden Corral's claims administrator sent a letter to Lenart dated May 8, 2013, asking Lenart to contact them. On June 7, 2013, Lenart's counsel wrote the claims administrator indicating his representation of Lenart, noting that Lenart was still being treated for her injuries, and stating that he would be in touch within two months. The claims administrator responded on June 19, 2013, requesting Lenart's recorded statement to complete its investigation.

[15] On October 24, 2013, Lenart filed a complaint for negligence alleging that Golden Corral failed to prepare and serve its barbeque chicken wings in a manner safe for human consumption and that as a result of eating such chicken wings, she sustained injuries and damages. In its answer, Golden Corral denied the essential averments of Lenart's complaint and asserted affirmative defenses, including that the claimed defective product conformed to the generally recognized state of the art under the IPLA.

[16] Prior to trial both parties unsuccessfully moved for summary judgment. In support of her motion for partial summary judgment, Lenart submitted the affidavit of Dr. Hutchinson in which Dr. Hutchinson stated: "As of May 31, 2013, it was my understanding that in the weeks prior, [Lenart] visited a

Golden Corral restaurant, located in Clarksville, Indiana, where she unknowingly consumed undercooked chicken wings." *Appellant's Appendix Vol. 2* at 60. Based on her conversations with Lenart, a review of Lenart's medical history, and her experience, Dr. Hutchinson noted that she engaged in a differential diagnosis and concluded "[t]o a reasonable degree of medical probability, it is more probably true than not true, that [Lenart]'s umbilical hernia was caused by her violent episodes of vomiting, which is related to consuming the undercooked chicken wings at Golden Corral on April 28, 2013." *Appellant's Appendix Vol. 2* at 60. Dr. Hutchinson further opined:

> [B]ut for consuming the undercooked chicken wings, which there is no dispute, there is no other medically supported reason to explain why [Lenart] experienced the violent episodes of vomiting, which vomiting caused [Lenart]'s umbilical hernia. Further it is known that there are food-borne pathogens, such as Staphlococcus [sic] and Bacillus cereus, which have an incubation period consistent with the onset of symptoms experienced by [Lenart].

*Id.* at 61. Golden Corral moved to strike Dr. Hutchinson's affidavit, or in the alternative, for an extension of time in order for Golden Corral to depose her. The trial court granted the latter request.

[17] After taking Dr. Hutchinson's deposition, Golden Corral again moved to strike her affidavit and deposition testimony on grounds that her opinion did not meet the reliability requirements of Ind. Evid. R. 702 for admissibility of an expert opinion. The trial court denied Golden Corral's motion to strike, thereby indicating Dr. Huchinson's proffered expert opinion as to the cause of Lenart's

sickness and injury would be admissible at trial.[3] Golden Corral again challenged the admissibility of Dr. Hutchinson's testimony and opinion as to causation by filing a motion in limine. The trial court denied Golden Corral's motion in limine.

[18] A four-day jury trial commenced on February 20, 2018. At trial, Dr. Hutchinson testified via her videotaped deposition and, later, provided in-person testimony as a rebuttal witness. Golden Corral did not object at trial to Dr. Hutchinson's testimony on the basis it challenged her testimony in pretrial motions. At the end of Lenart's case-in-chief, Golden Corral moved for judgment on the evidence, arguing that Lenart failed to present sufficient evidence to prove proximate cause. The court denied the motion. Golden Corral renewed its motion for judgment on the evidence after the close of all evidence, which motion the trial court again denied.

[19] Prior to the case being given to the jury, Lenart tendered instructions on spoliation of evidence (based on Golden Corral's failure to preserve the buffet temperature logs and Lenart's daughter's plain chicken wing that Kenneth took to the manager) and *res ipsa loquitur*. Over Golden Corral's objection, the trial court gave Lenart's tendered instructions to the jury.

---

[3] Golden Corral asked the trial court to certify the denial of its motion to strike for interlocutory appeal, which the trial court denied.

[20]     The jury ultimately returned a verdict in favor of Lenart and awarded her $240,000 in damages. On March 2, 2018, the trial court entered final judgment on the jury's verdict. Golden Corral now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

### 1. Admission of Expert Testimony

[21]     Golden Corral argues that the trial court abused its discretion in allowing Dr. Hutchinson to testify as an expert regarding the cause of Lenart's illness and subsequent injury because the scientific methodology employed by Dr. Hutchinson was not reliable and thus, did not meet the admissibility requirements of Evid. R. 702. Lenart argues that Golden Corral waived this issue for appellate review by failing to object at trial to Dr. Hutchinson's direct (by deposition) and rebuttal (in person) testimony on the basis of Evid. R. 702.

[22]     It is well established that a trial court's ruling on a motion in limine does not determine the ultimate admissibility of the evidence; that determination is made by the trial court in the context of the trial itself. *Clausen v. State*, 622 N.E.2d 925, 927 (Ind. 1993). Case law makes clear that any objection to the challenged evidence must be reasserted at trial contemporaneously with the introduction of

such evidence or the issue is waived.[4] *Shoultz v. State*, 995 N.E.2d 647, 654-655 (Ind. Ct. App. 2013), *trans. denied*; *see also Raess v. Doescher*, 883 N.E.2d 790, 796-97 (Ind. 2008) ("Failure to object at trial to the admission of the evidence results in waiver of the error, notwithstanding a prior motion in limine.").

[23] Here, Golden Corral did not object at trial to Dr. Hutchinson's direct or rebuttal testimony on grounds that her opinion testimony was based on unreliable scientific principles and not admissible under Evid. R. 702. Golden Corral therefore waived this argument for appellate review.

[24] Waiver notwithstanding, we note that Golden Corral thoroughly presented its arguments challenging the admissibility of Dr. Hutchinson's testimony through pretrial motions in limine and a motion to exclude. Specifically, Golden Corral argued that the methodology (i.e., differential diagnosis) employed by Dr. Hutchinson in arriving at her expert opinion that Lenart contracted a foodborne illness from eating undercooked chicken at Golden Corral was faulty because she did not rule out all other possible causes for Lenart's sickness. Golden Corral also argues that Dr. Hutchinson's conclusion as to causation was "improperly based primarily upon a temporal relationship (i.e., the fact that Lenart reported getting sick two hours after eating at Golden Corral)." *Appellant's Brief* at 35. We are unpersuaded by Golden Corral's argument that

---

[4] An exception exists where a trial court assures the defense that his objection has been preserved. *Vehorn v. State*, 717 N.E.2d 869, 872-73 (Ind. 1999); *Swanson v. State*, 730 N.E.2d 205, 208 (Ind. Ct. App. 2000), *trans. denied*. Golden Corral does not argue that the trial court made any such assurances.

such undermined the reliability of the methodology employed by Dr. Hutchinson so as to render her testimony inadmissible.

[25] Dr. Hutchinson engaged in a differential diagnosis, which is "a standard scientific technique accomplished by determining the possible causes of a patient's symptoms and then eliminating each of these potential causes until isolating one that cannot be ruled out or by determining which of those that cannot be ruled out is the most likely." *Triplett v. USX Corp.*, 893 N.E.2d 1107, 1118 (Ind. Ct. App. 2008) (quoting *Lennon v. Norfolk and W. Ry. Co.*, 123 F.Supp.2d 1143, 1153 (N.D. Ind. 2000)), *trans. denied*. A reliable differential diagnosis is performed after completing a physical examination, taking a medical history, and reviewing clinical tests, including laboratory tests. *Id*. Dr. Hutchinson described the manner in which she conducted a differential diagnosis—that she considered Lenart's medical history and information provided by Lenart (i.e., that she had eaten raw chicken wings) and ruled out several possible causes, including certain physical ailments and congenital conditions. She acknowledged that she could not rule out all possible causes for Lenart's sickness,[5] but that given her medical training and experience, it was "reasonable" to conclude that Lenart contracted an unidentified foodborne

---

[5] For example, Dr. Hutchinson could not rule out certain non-foodborne bacterium or viruses.

pathogen[6] from eating the chicken wings at Golden Corral. *Appellant's Appendix Vol. 2* at 139.

[26]    As the trial court properly determined, Golden Corral's challenges to Dr. Hutchinson's testimony went to the weight of such testimony, not admissibility. *See Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 461 (Ind. 2001) (noting that where the trial court is satisfied that the expert's general methodology is based on reliable scientific principles, "the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact").    Moreover, Golden Corral thoroughly cross-examined Dr. Hutchinson about the methodology she employed, pointed out for the jury what it perceived as shortcomings in the manner in which she reached her expert opinion, and presented its own expert witness who provided an opinion contrary to Dr. Hutchinson's in some respects.    The trial court did not abuse its discretion in allowing Dr. Hutchinson to provide her expert opinion as to causation of Lenart's sickness.

## 2.  Proximate Cause

---

[6] Dr. Hutchinson acknowledged that there were numerous foodborne pathogens that applied to Lenart's symptom profile, only two of which had incubation periods that correlated with the timing of Lenart's illness relative to her consumption of the wings.  She further testified that there is no way to know for sure which foodborne pathogen caused Lenart's sickness without being able to test a stool sample or the chicken wing.

[27] Golden Corral argues that the trial court erred in denying its motions for judgment on the evidence. A motion for judgment on the evidence challenges the legal sufficiency of the evidence. *Walgreen Co. v. Hinchy*, 21 N.E.3d 99, 106 (Ind. Ct. App. 2014), *trans. denied* (2015). When reviewing a trial court's ruling on a judgment on the evidence, we apply the same standard as the trial court. *Kimbrough v. Anderson*, 55 N.E.3d 325, 336 (Ind. Ct. App. 2016), *trans. denied*. "We may not substitute our judgment for that of the jury on questions of fact nor should a motion for judgment on the evidence be granted because the evidence preponderates in favor of the moving party." *Id*. Instead, we determine only whether any reasonable evidence exists to support the nonmovant's claim and, if so, whether the inference supporting the claim can be drawn without undue speculation. *Id*. The motion should be granted only where there is no substantial evidence to support an essential issue in the case. *Solnosky v. Goodwell*, 892 N.E.2d 174, 181 (Ind. Ct. App. 2008). "If there is evidence that would allow reasonable people to differ as to the result, judgment on the evidence is improper." *Id*.

[28] Here, Lenart claimed that Golden Corral was negligent in the manner in which it prepared and served its barbeque chicken wings. To establish negligence, Lenart was required to show that Golden Corral (1) owed her a duty of care; (2) breached that duty; and that (3) she suffered injury proximately caused by the breach. *See Hassan v. Begley*, 836 303, 307 (Ind. Ct. App. 2005). Golden Corral argues that Lenart did not satisfy her burden to establish that her symptoms and injuries were proximately caused by Golden Corral.

[29] Golden Corral first argues that "the record is devoid of any scientifically reliable evidence." *Appellant's Brief* at 42. Golden Corral also argues that Lenart's entire case was based on circumstantial evidence between the timing of her lunch and the manifestation of her symptoms, which Golden Corral asserts amounts to nothing more than speculation. Golden Corral's argument in this regard is essentially a challenge to the weight to be afforded Dr. Hutchinson's testimony on causation.

[30] Dr. Hutchinson testified via video deposition that she engaged in a differential diagnosis and that based on information provided by Lenart, Lenart's medical history, as well as her own medical training and experience, she was of the opinion that Lenart contracted one of a couple food pathogens having an incubation period consistent with the timeframe between when Lenart consumed the barbeque chicken wings and when she became sick. Dr. Hutchinson acknowledged that there was no way to definitively know what foodborne pathogen Lenart was exposed to but opined that her opinion was reasonable and appropriate given the available information. Lenart presented sufficient evidence as to the element of proximate cause to withstand Golden Corral's motions for judgment on the evidence. The trial court did not abuse its discretion in denying such motions.

## 3. Final Instructions

[31] Golden Corral argues that the trial court abused its discretion by instructing the jury, over its objection, on spoliation and the doctrine of *res ipsa loquitur*.

Instructions serve to inform the jury of the law applicable to the facts presented at trial, enabling it to comprehend the case sufficiently to arrive at a just and correct verdict. *Blocher v. DeBartolo Properties Management, Inc.*, 760 N.E.2d 229, 235 (Ind. Ct. App. 2001), *trans. denied*. In reviewing a trial court's decision to give a tendered instruction, we consider 1) whether the instruction correctly states the law, 2) whether there is evidence in the record supporting the instruction, and 3) whether the substance of the instruction is covered by other instructions. *Wal-Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 893 (Ind. 2002). The trial court has sole discretion in instructing the jury and thus, we will reverse on the last two issues only when the instructions amount to an abuse of discretion. *Id.* A party seeking a new trial on the basis of an improper jury instruction must show a reasonable probability that its substantial rights have been adversely affected. *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 944 (Ind. 2001). In other words, "[a]n erroneous instruction merits reversal if it could have formed the basis for the jury's verdict." *Fleetwood Enter., Inc. v. Progressive N. Ins. Co.*, 749 N.E.2d 492, 495 (Ind. 2001).

### A. Spoliation

[32] We first consider whether the court properly gave an instruction on spoliation. Over Golden Corral's objection, the trial court gave Final Instruction No. 9 to the jury:

> If Golden Corral fails to produce documents under Golden
> Corral's exclusive control, such as the temperature logs for the
> barbecue chicken wings Ms. Lenart consumed and/or the plain

chicken wing that Kenneth Lenart took to the manager of Golden Corral on April 28, 2013, you may conclude that these temperature logs and/or plain chicken wing, that Golden Corral could have produced, would have been unfavorable to Golden Corral's case.

*Appellant's Appendix Vol. 5* at 24. On appeal, Golden Corral argues that the trial court abused its discretion in giving this instruction because there is no evidence that it "**intentionally**" destroyed evidence. *Appellant's Brief* at 52 (emphasis in original). Golden Corral also argues that the instruction was "irrelevant and not supported by the evidence." *Id.*

[33] The party raising a claim of spoliation has the burden of proving that there was a duty to preserve the evidence on the part of the alleged spoliator. *Glotzbach v. Froman*, 854 N.E.2d 337, 338-39 (Ind. 2006) (noting that duty to preserve evidence may be assumed voluntarily or imposed by statute, regulation, contract, or other circumstances). The duty to preserve evidence occurs when a first-party claimant "knew, or at the very least, should have known, that litigation was possible, if not probable." *N. Ind. Pub. Serv. Co. v. Aqua Envtl. Container Corp.*, 102 N.E.3d 290, 301 (Ind. Ct. App. 2018).

[34] "In Indiana, the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it." *Porter v. Irvin's Interstate Brick & Block Co., Inc.*, 691 N.E.2d 1363, 1364-1365 (Ind. Ct. App. 1998) (citing *Westervelt v. Nat'l Mfg. Co.*, 69 N.E. 169, 172 (Ind. App. 1903)). This rule is typically applied "to a

party which has suppressed evidence believed to be in its control at the time of the law suit." *Id.* at 1365. Like we held in *Porter*, "we see no reason why [this rule] should not be applied where the party spoliates evidence prior to the commencement of a law suit that the party knew or should have known was imminent." *Id.*

[35] Here, we agree with Lenart that Golden Corral was immediately on notice of her illness and was contacted by her attorney within the ninety-day period during which Golden Corral retained its temperature logs. The buffet temperature logs were likewise relevant to the issue of whether Lenart contracted a foodborne pathogen from the barbeque chicken wings she consumed as the chicken wings had been prepared and served on Golden Corral's buffet. Under these circumstances, Golden Corral had a duty to maintain such records. Because Golden Corral destroyed the buffet temperature logs despite its knowledge and duty, the spoliation instruction was warranted.

[36] Golden Corral also argues that the spoliation instruction was improper because it had no duty to preserve the plain chicken wing that was brought to the manager's attention. We agree with Golden Corral that Lenart has not established that Golden Corral had a duty to keep the plain chicken wing that was allegedly undercooked. Notwithstanding, Golden Corral has not established a reasonable probability that such affected its substantial rights. To be sure, Lenart presented direct and circumstantial evidence from which the

jury could have reasonably reached the same conclusion permitted by the negative inference instruction.

## B. *Res Ipsa Loquitur*

[37]     We next consider whether the instruction on the doctrine of *res ipsa loquitur* was warranted given the facts of this case. The trial court, over Golden Corral's objection, instructed the jury with regard to the elements of *res ipsa loquitur* in Final Instruction No. 19, which provided:

> There are certain situations in which the nature of an incident and the circumstances surrounding it lead to the reasonable belief that it would not have occurred unless someone did not use reasonable care.
>
> If Kristina Lenart proves all of the following by the greater weight of the evidence:
>
> 1. Mrs. Lenart was injured as a result of consuming the under cooked chicken wings;
>
> 2. Only Golden Corral controlled the undercooked chicken wings; and
>
> 3. Under normal circumstances Mrs. Lenart would not have gotten ill unless Golden Corral was negligent.
>
> Then you may infer that the incident resulted from Golden Corral's negligence.

You may consider this inference with all of the other evidence in arriving at your verdict.

*Appellant's Appendix Vol. 5* at 34.  This instruction was derived from Indiana Civil Pattern Jury Instruction 325 and purports to instruct the jury on the doctrine of *res ipsa loquitur*.  The doctrine of *res ipsa loquitur* is a qualified exception to the general rule that the mere fact of injury will not create an inference of negligence.  *Syfu v. Quinn*, 826 N.E.2d 699, 703 (Ind. Ct. App. 2005).

[38]   *Res ipsa loquitur* literally means, "the thing speaks for itself."  *Narducci v. Tedrow*, 736 N.E.2d 1288, 1292 (Ind. Ct. App. 2000).  The doctrine of *res ipsa loquitur* is a rule of evidence that "permits an assumption that in some situations an occurrence is so unusual that, absent a reasonable justification or explanation, the person in control of the situation should be held responsible."  *Hale v. SS Liquors, Inc.*, 956 N.E.2d 1189, 1194 (Ind. Ct. App. 2011).  Specifically, this court has held that:

> Under the doctrine of *res ipsa loquitur*, negligence may be inferred where 1) the injuring instrumentality is shown to be under the management or exclusive control of the defendant or his servants, and 2) the accident is such as in the ordinary course of things does not happen if those who have management of the injuring instrumentality use proper care.

*Vogler v. Dominguez*, 624 N.E.2d 56, 61 (Ind. Ct. App. 1993), *trans. denied*.

[39] Application of the doctrine does not in any way depend on the standard of care imposed by law but, rather, depends entirely upon the nature of the occurrence out of which the injury arose. *Narducci*, 736 N.E.2d at 1292. The central question involved in the use of the *res ipsa loquitur* doctrine is whether the incident more probably resulted from the defendant's negligence rather than from some other cause. *K-Mart Corp. v. Gipson*, 563 N.E.2d 667, 669 (Ind. Ct. App. 1990). As we have before stated:

> When presented with a request for a *res ipsa loquitur* instruction, the trial court's duty is to determine whether the plaintiff produced evidence from which the jury could reasonably conclude the existence of the underlying elements of exclusive control and probability of negligence. This is a sufficiency question. There only need be evidence and reasonable inferences therefrom, which, when viewed in the light most favorable to the proponent, would support the [theory] contained in the instruction. If there is no such evidence, the instruction is properly refused. On the other hand, if there is evidence from which a jury could reasonably find the existence of the elements, then the conditional *res ipsa loquitur* instruction, which merely tells the jury that if they do find the existence of these elements then they may draw the inference of negligence, must be given.

*Sharp v. LaBrec, Inc.*, 642 N.E.2d 990, 993 (Ind. Ct. App. 1994), *trans. denied*.

[40] It is not necessary for a plaintiff to exclude every other possibility other than the defendant's negligence as a cause for the plaintiff's injury. *Merriman v. Kraft*, 249 N.E.2d 485, 487 (Ind. 1969). A plaintiff relying upon the doctrine "may show that the event or occurrence was more probably the result of negligence by relying upon common sense and experience or by expert testimony." *Gold v.*

*Ishak*, 720 N.E.2d 1175, 1181 (Ind. Ct. App. 1999) (citing *Shull v. B.F. Goodrich Co.*, 477 N.E.2d 924, 928 (Ind. Ct. App. 1985), *trans. denied*), *trans. denied* (emphasis omitted). We further note that the quantum of evidence necessary for the giving of an instruction "is deliberately set at a relatively low level in order to assure the right of parties to have the trier of fact determine factual disputes thus preserving the constitutional rights to a trial by jury." *Shull*, 477 N.E.2d at 927-28.

[41] Golden Corral argues that Lenart cannot identify the instrumentality that caused her illness/injury or demonstrate that such instrumentality was within Golden Corral's exclusive control. We disagree. Lenart's claim was that she suffered from food poisoning after she consumed undercooked barbeque chicken wings at Golden Corral. She thus identified the instrumentality as the chicken wing she consumed.

[42] The facts most favorable to Lenart are that she had no medical history of abdominal problems, she was feeling fine before she went to Golden Corral, and within two hours of eating barbeque chicken wings at Golden Corral she became violently ill with diarrhea and intense vomiting. Further, there are two foodborne pathogens that have incubation periods that correlate with the onset of Lenart's symptoms, one of which (staphylococcus) is also associated with poultry. Lenart also presented evidence that plain chicken wings exclusively prepared and served by Golden Corral were undercooked and that undercooked chicken can be contaminated with a foodborne pathogen. A reasonable inference could be drawn that the barbeque chicken wings Lenart ate were

similarly undercooked and contaminated. Lenart's expert witness opined that "[w]hen you have a temporal relationship" between food consumption and the development of symptoms like Lenart experienced, it "seems reasonable and appropriate" that Lenart's vomiting resulted from eating undercooked chicken wings contaminated with a foodborne pathogen and that such vomiting caused her hernia. *Appellant's Appendix Vol. 2* at 139.

[43] Once a plaintiff has presented sufficient evidence to bring himself within the operation of the doctrine, the burden of going forward with the evidence to explain the accident is cast upon the defendant. *Hammond v. Scot Lad Foods, Inc.*, 436 N.E.2d 362, 364 (Ind. Ct. App. 1982). Here, Golden Corral had the opportunity to defend itself and did offer other possible explanations for Lenart's sickness (i.e., virus or foodborne pathogen with longer incubation period that Lenart contracted before she visited Golden Corral) and resulting injury. However, even though the defendant comes forward with an explanation of the accident and evidence of his careful inspection, tests, and due care, the inference of negligence drawn from the facts does not disappear from the case, but instead remains, and is placed upon the scales to be weighed by the trier of fact along with any and all explanations of the defendant, as well as all of the other evidence. *Id.*

[44] In short, Lenart presented sufficient evidence from which a jury could reasonably find the existence of the elements of *res ipsa loquitur*. In such case, "the conditional *res ipsa loquitur* instruction, which merely tells the jury that if they do find the existence of these elements then they may draw the inference of

negligence, must be given." *See Sharp*, 642 N.E.2d at 993. The trial court did not abuse its discretion in instructing the jury on the doctrine of *res ipsa loquitur*.

## 4. IPLA

[45] Golden Corral argues that the trial court erred in allowing the case to be tried as a negligence action as Lenart's claim is governed exclusively by the IPLA.[7] Specifically, Golden Corral maintains that the barbeque chicken wing (the claimed defective product) is personalty and that it is a manufacturer by virtue of the preparation and cooking process. Lenart disagrees, asserting that her visit to Golden Corral predominately involved the sale of a service. Lenart also argues that Golden Corral does not qualify as a manufacturer so as to fall within the ambit of the IPLA. The trial court agreed with Lenart insofar as it concluded that Golden Corral was not a manufacturer.

[46] The IPLA "governs all actions that are: (1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1; Ind. Code § 34-6-2-115 (defining "product liability action").

[47] Under the IPLA, a manufacturer is "a person or an entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a

---

[7] Prior to trial, Golden Corral unsuccessfully moved in limine to exclude any evidence alleging that it failed to exercise reasonable care or was negligent because Lenart's claim was governed exclusively by the IPLA.

component part of a product before the sale of the product to a user or consumer." I.C. § 34-6-2-77(a). Golden Corral asserts that its control over the food preparation and cooking process makes it a manufacturer of food that it serves in its restaurant. *See* I.C. § 34-6-2-77(a)(2). In the alternative, Golden Corral asserts that it is deemed a manufacturer because it is a seller that alters or modifies the product in a significant manner before selling it to the ultimate consumer. *See* I.C. § 34-6-2-77(a)(3). Specifically, Golden Corral claims that through the cooking process, it turns inedible, raw chicken into a product that is edible and delicious. We are not persuaded.

[48] There are no Indiana cases that directly address whether a restaurant is a manufacturer for purposes of the IPLA. We therefore look to cases in which we have found an entity to be a manufacturer. In *Lenhardt Tool & Die Co. v. Lumpe*, 703 N.E.2d 1079, 1085 (Ind. Ct. App. 1998), *trans. denied*, this court stated that "[w]here an entity reconditions, alters, or modifies a product or raw material to the extent that a new product has been introduced into the stream of commerce, the entity is a manufacturer and provider of products under the [IPLA]." The court noted that a plant would ship solid blocks of metal to Lenhardt Tool & Die (LTD) with drawings and specifications. LTD would then machine the block of metal into molds per the designs found in the drawings and specifications. We held that "[LTD] transformed the metal block into 'a new product' that is substantially different from the raw material used. Therefore, it has introduced a new product into the stream of commerce and provided products to [the plant], not mere services." *Id*.

[49]     In this case, Golden Corral prepared and cooked the raw chicken wings it received from its distributor by placing them in a fryer at a set temperature for a set amount of time. At the end of the cooking process, the chicken wing was still a chicken wing, although now (if cooked properly) safe for human consumption. The cooking process did not substantially alter the chicken wing or create a new product. The trial court did not err in concluding that Lenart's action was not controlled by the IPLA.

[50]     Judgment affirmed.

Najam, J. and Pyle, J., concur.